## COLD METAL PROCESS CO. v. UNITED ENGINEERING & FOUNDRY CO.
### No. 6700.

Circuit Court of Appeals, Third Circuit.
June 15, 1939.

Rehearing Denied Nov. 14, 1939.

Reed, Smith, Shaw & McClay, of Pittsburgh, Pa., and Thomas G. Haight, of Jersey City, N. J., for appellant.

Charles F. C. Arensberg, Patterson, Crawford, Arensberg & Dunn, and Brown, Critchlow & Flick, all of Pittsburgh, Pa., for appellee.

Before DAVIS, BUFFINGTON, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

This is an appeal from the decree of the District Court holding the agreement of June 20, 1927, [1] to be a "valid and subsisting contract" for an exclusive license to United Engineering and Foundry Company, hereinafter called United, under the Steckel patent No. 1,779,195.

---

[1] This Agreement Made at Pittsburgh, Pennsylvania, this 20th day of June, 1927, by and between The Cold Metal Process Company, an Ohio Corporation, of Youngstown, Ohio, hereinafter called "Cold Metals", and United Engineering & Foundry Company, a Pennsylvania Corporation, of Pittsburgh, Pennsylvania, hereinafter called "United", Witnesseth That:

Whereas, both parties own certain applications pending in the United States Patent Office relating to 4-high rolling mills and the rolling of thin material; and

Whereas, it has been suggested to the parties by their attorneys that it may be possible to secure claims to a certain subject-matter common to both parties' applications;

Now, Therefore, in consideration of the sum of one dollar ($1.00) and other good and valuable consideration paid by each party to the other party, the receipt of which is hereby acknowledged, and in further consideration of the mutual covenants hereinafter contained, the parties hereto agree for themselves, their successors and assigns, as follows:

1. The parties will, through their appropriate officers, immediately hold a conference at which their patent attorneys, Byrnes, Stebbins & Parmelee, shall be authorized by both parties to suggest claims covering certain subject-matter common to both parties' applications, and which it is understood are not at the present time being presented in Cold Metals applications; together with a plan for securing the allowance of such claims;

2. Cold Metals shall not, after such conference, present in its application claims of the scope suggested at the conference, or directed to the subject-matter common to both parties' applications, if such claims are broader or of different scope than the claims now presented in Cold Metals application, except with the agreement and cooperation of United.

3. When and if such claim or claims to common subject-matter are granted in any patent issued on Cold Metals' applications, Cold Metals shall grant to United a license to make, use and sell rolling mills under such claim or claims, which license shall be exclusive to United for 4-high hot mills and for 4-high cold mills, in which the major portion of the power required by a roll stand is supplied to the rolls directly and not through tension exerted on the material for pulling it through the rolls; Cold Metals, however, reserving the right to make or have made for its own use and to use in its own plant or plants such hot and cold mills, and provided further that Cold Metal shall have the right to make, use, and sell, or to license others to make, use, or sell, such 4-high hot mills in combination with means for coiling the rolled strip between passes as described in the pending application of A. P. Steckel, Serial No. 198,-915, filed June 15, 1927.

4. Immediately after such conference and without waiting for such claims to be secured, the parties shall negotiate the payment to be made by United to Cold Metals for such license, when and if granted. If the parties cannot agree upon such payment, the matter shall be submitted to three arbitrators, whose majority decision shall be accepted as final

This litigation between the parties has been here twice before. The first suit was filed March 7, 1931, in the District Court for the Western District of Pennsylvania for the infringement of the patent issued to A. P. Steckel, October 21, 1930, for "an improved rolling mill and method whereby superior results are obtained." The Court held that United was not guilty of infringement of the patent because it had a valid license under the patent. An appeal from the decree was taken to this court which dismissed the bill of complaint on the ground that United was "enjoying and possessing such license" under the patent and, therefore, it could not attack its validity.

The second suit was begun November 17, 1934, by Cold Metal in the District Court for the Western District of Pennsylvania for specific performance of the agreement and for an injunction restraining United from prosecuting two suits which it had begun, one in the Northern District of Ohio and the other in the Northern District of Indiana. The District Court refused the injunction, 9 F.Supp. 994, but this court on appeal in the case as then made, 3 Cir., 79 F.2d 666,—evidence of the plaintiff alone being before it, no testimony having been offered by United—reversed the decree, granted the injunction and said that the 1927 agreement could not be performed because its terms were too indefinite.

A supplemental bill was filed by Cold Metal on May 11, 1936, in the Western District of Pennsylvania. Cold Metal in this suit refused to elect either to affirm or disaffirm the agreement. It took the position that the court should rescind the agreement, but if it did not, then, in the alternative, it should grant specific performance. United moved to dismiss the bill of complaint, but the court refused the motion without prejudice. An answer was then filed and the case came on for final hearing.

The court refused the prayer for rescission and injunction, but granted the prayer for specific performance and provided in its decree for the appointment of a master to ascertain the amount of damage due Cold Metal under the agreement by United. The case is here on appeal from that decree.

Cold Metal in its bill of complaint filed October 15, 1934, charged United with fraud in several particulars and renewed them in its supplemental bill filed May 11, 1936. This is one of the main grounds on which it relies to rescind the agreement.

On the hearing on motion of Cold Metal for a preliminary injunction on the record then before us we thought that the charge of fraud might be sustained, but on final hearing, when the charges have been answered and explained by United, we have before us quite a different case.

Cold Metal says an agreement which United made with the Mesta Machine Company, hereinafter called "Mesta", on October 28, 1931, shows fraud on the part of United. In our opinion filed September 27, 1935, on the motion of Cold Metal for a preliminary injunction, we said that this was a "secret agreement" between United and Mesta; that "Cold Metal did not know of this agreement until it came out at the hearing in the proceedings by Cold Metal against United for a preliminary injunction in 1934 in equity suit No. 2506". But the learned District Judge on final hearing after full testimony by both sides has found, and we think on sufficient evidence, that Cold Metal knew of the agreement between Mesta and United before it filed the original bill on November 17, 1934. In any event this agreement did not seem to Cold Metal to be important for it was not until May 11, 1936, nearly a year and a half after it knew of this agreement, that it decided to do anything about it. Then it filed the supplemental bill seeking to rescind the agreement and at that time urged that the Mesta-United agreement was after-discov-

by both parties. The three arbitrators shall be as follows:

Marshall A. Christy, of Pittsburgh, Pa., Rollin C. Steese, of Youngstown, Ohio, Charles H. Booth, of Youngstown, Ohio.

In case any of the arbitrators cannot serve, another or other arbitrators may be selected by the parties, but in case the parties cannot agree on such substitute arbitrator or arbitrators, then the above named arbitrators shall select the substitute arbitrator or arbitrators.

In Witness Whereof, the parties hereto have caused this agreement to be signed, sealed and delivered as of the day and year first above written.

   The Cold Metal Process Company
     By A. P. Steckel, (Seal)
        President.

Attest:
  W. H. Kilcawley,
    Secretary.

United Engineering & Foundry Company,
   By F. C. Biggert, Jr.,
      President.

(Seal)

Attest: Chas. E. Satler,
     Secretary.

ered evidence entitling Cold Metal to a rescission, but the trial judge did not think this contention meritorious and on the record as it now appears, we think he did not err.

United and Mesta are the largest builders of 4-high mills, building about 95% of the output. Mesta has never regarded the Steckel patent 195 as valid and has never paid any attention to it. Cold Metal admitted that "Mesta made quite a number of requests over a considerable period of time for Cold Metal to sue it", but for some reason it was never done, although Cold Metal did on March 7, 1931, sue United as an infringer of the Steckel patent and repudiated the 1927 agreement (Suit No. 2506). In view of this fact it is not surprising that United entered into an agreement with Mesta for mutual protection. Cold Metal itself entered into an agreement with Mesta, giving it "equal rights with United" on March 20, 1933, three years before the supplemental bill was filed, to rescind the 1927 agreement.

■ There is really nothing in the agreement between United and Mesta to which Cold Metal could reasonably object. In substance it provided that if the 1927 agreement was not sustained in the pending suit, Mesta would try to secure a license from Cold Metal and would give United a sublicense, but, on the other hand, if the 1927 agreement was sustained, United would, upon request by Mesta, and to the extent that it legally could, grant Mesta a sub-license on the same royalty basis that it had. But as a matter of fact no request was ever made by Mesta. The trial judge refused to find fraud in this transaction and in this we can not convict him of error.

■ The second ground on which Cold Metal seeks to rescind the 1927 agreement was the making of certain contracts by United with the American Rolling Mill Company, hereinafter called "Armco".

United entered into four agreements with Armco and the following provision contained in the fourth agreement of June 13, 1929, seems to be the only provision to which Cold Metal objects: "United Engineering & Foundry Company hereby agree for themselves and their representatives and assigns, to make no change in the above-mentioned contract, 'Exhibit EA', with the Cold Metal Process Company (the agreement of June 20, 1927), nor to cancel the same, without previously having secured the written consent of the American Rolling Mill Company."

This provision could in no respect change or affect the rights of Cold Metal under the 1927 agreement. On the contrary it was an additional guaranty that its rights would not be changed and to this Cold Metal had no right to object. The negotiations disclose the fact that Cold Metal was anxious to have the 1927 agreement modified or rescinded and it is readily understood why it disliked the Armco agreement which prevents any modification or rescission of the 1927 agreement without the consent of Armco. All that the Armco agreement did was to assure Armco that the 1927 agreement would not be changed or terminated without its consent. This might prove to be inconvenient or disadvantageous to Cold Metal or even to United, but it does not constitute bad faith or fraud and apparently did not prove to be advantageous to United for the District Court found that United never received any royalties from Armco and that the Armco agreement did not in any respect change the 1927 agreement or prevent it from being carried out.

■ Cold Metal also charges that the conduct of United in two suits brought by Cold Metal in New Jersey was fraudulent.

The first suit was against the United States Steel Corporation, hereinafter called the "Steel Corporation", and American Sheet & Tin Plate Company, hereinafter called the "Tin Plate Company". This suit involved other Steckel patents than patent No. 1,779,195, commonly called the "195" patent. This appears to be the only Steckel patent in which United was interested. The Steel Corporation wanted United to assist in defending this suit in so far as it related to equipment sold by it to the Tin Plate Company, but the 1927 agreement and the guaranties of United to the Tin Plate Company were not involved in this suit and United replied, saying, in substance, that it was not interested. The president of the Tin Plate Company asked United to share in the cost of the suit. United said that it was not required under its guaranties "to defend or pay any part of the defense of the suit," yet it was willing to pay for the time its own patent counsel spent in assisting in the preparation and trial of the case. This was a perfectly natural position for United to take in view of the fact that Cold Metal three years before had sued it as an infringer of the Steckel patent '195, had repudiated the agreement

of June 20, 1927 and had sought to rescind it.

On June 5, 1934, United asked Cold Metal to join in a suit against the E. W. Bliss Company in the Northern District of Ohio for the infringement of the Steckel patent '195. While United was waiting for Cold Metal to decide whether or not it would join in the suit, Cold Metal, on July 7, 1934, filed its second suit in New Jersey against the Steel Corporation and the Tin Plate Company for the infringement of Steckel patent '195 on account of equipment or material sold them by United.

On July 18, 1934, United was notified by the Steel Corporation and the Tin Plate Company that it should come in and defend the suit. Fish, Richardson & Neave, counsel for the Steel Corporation, asked United to send them all defendant's exhibits in the prior suit of No. 2506. Cold Metal consented that this be done. Counsel for United told counsel for both parties to the suit that he was there as an observer only and if he could be of any assistance in supplying them with anything, he would be glad to have them call upon him. Cold Metal asked for nothing. Counsel for the Steel Corporation "asked for two formal papers". One was a blue-print of some drawing of United and the other was a paper referring to a prior art patent. These were not among the exhibits in suit No. 2506 and in furnishing them, United perhaps went beyond the consent of Cold Metal, but these papers amounted to nothing and do not constitute a basis for a charge of fraud or rescission of the 1927 agreement. United did not contribute any money at all toward the expenses of any of the New Jersey suits.

We do not think that the conduct of United in the two suits brought in New Jersey was fraudulent or showed bad faith.

This court on the record before us on appeal in the hearing for a preliminary injunction found that United did not act in good faith in bringing the suit against the E. W. Bliss Company in Ohio and the Continental Roll & Steel Foundry Company in Indiana. On final hearing the District Court apparently felt constrained to follow this court in so finding. It had refused so to find when the case was before it in the first place. John F. Oberlin, Esq., who represented United in bringing those suits, testified that he was instructed to try these cases to the best of his ability, "to the end of enforcing the patent ('195); that he was told by the officials of United, by its general counsel, C. F. C. Arensberg, Esq., and by the general patent counsel of United that every resource that United had were at his hand, and any assistance or cooperation that he might ask for would be furnished, to the end of successfully trying the case." On principle and comity, and especially on the record as it now stands before us, freed as we think from fraud, we feel that the questions which are justiciable before the District Courts of Ohio and Indiana should be left to those courts without interference from the courts of this circuit.

■ Cold Metal further says that the agreement of 1927 should be rescinded because United has been guilty of bad faith with it in negotiations for settlement.

It contends that United's insistence that the Steckel patent '195 be held valid by a court of last resort as a condition precedent to settlement of the royalties shows bad faith.

It is a fact that the other companies which build 4-high mills, Mesta and Bliss, have entirely disregarded the Steckel patent and contend that it is invalid, especially in view of the use for years in mills in Bridgeport, Connecticut, of ."backing-up rolls, mounted in roller bearings." The persistent refusal of competing companies to pay any attention to the patent and the neglect or refusal of Cold Metal to sue them furnished in the mind of United a reason for not paying royalties under the agreement until the validity of the patent had been established. The evidence indicates rather conclusively that it was the original intention of the parties that United should not pay royalties under the agreement until the patent had been declared valid by a competent court. Consequently there is nothing in this charge establishing bad faith.

■ Cold Metal says that the license is invalid because the agreement of 1927 does not prescribe temporal or territorial limits for it. We do not think that this objection invalidates the license. It is to be a license under the patent and in the absence of anything to the contrary, the license is implicitly coextensive in time and territory with the patent.

■ It is now impossible to restore Cold Metal and United to their status quo at the time they entered into the agreement on June 20, 1927, when each had an application in the Patent Office for 4-high roller bearing mills, and neither knew which record

date was earlier or what claims were included or disclosed in the application of the other. Application for the Steckel patent had been assigned to Cold Metal and the Biggert and Johnson application had been assigned to United. As a result of the agreement of 1927 United was deprived of the right to contest the granting of the claims which were copied from its own (Biggert & Johnson) application into the Steckel patent. Under such circumstances, even though a party has not fully performed his contract according to its legal effect, the contract will not be rescinded if it has been partly performed and the parties would be embarrassed and the status quo cannot be restored. Blake v. Pine Mountain Iron & Coal Co., 6 Cir., 76 F. 624; Kauffman v. Raeder, 8 Cir., 108 F. 171, 54 L.R.A. 247; Dold Packing Co. v. Doerman, 8 Cir., 293 F. 315; America Land Co. v. City of Keene, 1 Cir., 41 F.2d 484.

■ Neither will a rescission be made where reliance has been upon a contract and considerable money, as here, has been spent in consequence. The lower court said: "Defendant, since the making of the June 20, 1927 contract has had a substantial investment in the making of rolling mill machinery. It would be inequitable now to decree a rescission thereof."

■ There is no provision in the 1927 agreement for the forfeiture of the license on account of a breach thereof and in the absence of such a provision courts will not rescind the license except where one of the parties has abandoned the contract or done something so gravely violative of its terms that irreparable injury has resulted to the plaintiff. Slezak v. Andrews, D.C., 21 F. Supp. 688; Oscar Barnett Foundry Co. v. Crowe, 3 Cir., 219 F. 450.

The agreement of June 20, 1927 was entered into under peculiar circumstances. Both parties to the litigation were at that time represented by the same firm of lawyers. Both parties were applying for a patent. Neither knew what claims, if any, were contained in the other's application. Steckel filed his original application on June 30, 1923, for a patent on an improved rolling mill. Biggert and Johnson filed an application for a backed-up 4-high roller bearing mill on April 20, 1926. In May, 1927, counsel came to realize that they were representing conflicting interests and without disclosing to either party the contents of the application of the other, suggested that a meeting be held to see if an agreement could be entered into to protect the interests of both parties and to avoid litigation. This meeting resulted in the agreement of June 20, 1927.

On May 23, 1928, without the consent of United, Steckel filed an amendment in which he copied into the Steckel application claims 1 to 4 and 6 to 13 of the claims of the Biggert and Johnson patent and requested an interference to be declared between the Steckel and Biggert and Johnson applications. In this situation, it is alleged that it was agreed that neither party would file any preliminary statement. They thus avoided disclosing to the public their record dates which would allow Steckel to win on his date.

■ United alleges that it was not until the following year, 1929, that it learned what the Steckel application contained and was advised by new counsel that there was no basis in it for certain of the claims which had been copied from Biggert and Johnson. United in consequence tried to reopen the interference, but did not succeed because of the long delay. The only benefit which United received for its forbearance to contest the interference proceeding was the exclusive license which it secured by the agreement of June 20, 1927. This United is seeking to retain and Cold Metal is seeking to take away. Each party in signing the agreement doubtless thought it was getting something from, and was giving something to, the other. The one was getting a patent; the other an exclusive license under it. Cold Metal is unwilling to surrender the Steckel patent and United cannot be asked to give up its exclusive license. Cold Metal with a patent and United with an agreement giving it an exclusive license are in the position in which they placed themselves and we should leave them there. The agreement of 1927 is, as Judge McVicar found, "a valid and subsisting contract" for a license. This "contract" has been partly performed and equity requires that it be completed by supplying the amount which United must pay for the license in accordance with the intention of the parties. Kaufmann v. Liggett, 209 Pa. 87, 58 A. 129, 67 L.R.A. 353, 103 Am.St.Rep. 988; Castle Creek Water Company v. City of Aspen, 8 Cir., 146 F. 8, 8 Ann.Cas. 660; Gunton v. Carroll, 101 U.S. 426, 25 L.Ed. 985; Joy v. City of St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843. The evidence shows what that intention was, for the parties had an "understanding" as to what the royalties

would be and what that understanding was can readily be ascertained from the evidence by the master appointed or to be appointed by the District Court.

The learned District Judge did not err when he held the agreement to be a "valid, subsisting contract", and so regarding, the decree as modified is affirmed.